1
2
3
4              UNITED STATES DISTRICT COURT
5             NORTHERN DISTRICT OF CALIFORNIA
6

7    ELENA NACARINO,                    Case No.  20-cv-07437-EMC
8                Plaintiff,
9         v.                            **ORDER GRANTING IN PART AND
                                        DENYING IN PART DEFENDANT'S
10   CHOBANI, LLC,                      MOTION TO DISMISS**
11               Defendant.             Docket No. 30

12
13
14              **I.       INTRODUCTION**

15          Plaintiff Elena Nacarino brings this putative class action against Defendant Chobani, LLC.

16   Ms. Nacarino asserts four claims based in California consumer-protection law over allegedly

17   deceptive labeling on a yogurt container.  *See* Docket No. 26 ("SAC").  Specifically, she alleges

18   that the contested labeling falsely represents that the yogurt's vanilla flavoring comes exclusively

19   from the vanilla plant.  *See id.* ¶¶ 1-6.  Pending before the Court is Chobani's motion to dismiss

20   the operative complaint on five grounds: (1) the implausibility of Ms. Nacarino's claims of

21   consumer deception, (2) her lack of particularity in pleading those claims under Federal Rule of

22   Civil Procedure 9(b), (3) her failure to plausibly allege a predicate violation of federal law under

23   California's Unfair Competition Law and federal preemption of that UCL claim, (4) her lack of

24   standing to pursue injunctive relief, and (5) her inability to pursue equitable relief based on the

25   adequacy of available legal remedies.  *See* Docket No. 30 ("Mot").  For the following reasons, the

26   Court **GRANTS in part** and **DENIES in part** Chobani's motion to dismiss with leave to amend

27   only parts of the complaint.

28

United States District Court
Northern District of California

## II.  **BACKGROUND**

According to the Second Amended Complaint, the operative complaint in this case, Ms. Nacarino purchased a container of Chobani yogurt (the "Product") at a Whole Foods grocery store in San Francisco, California, in 2020.  SAC ¶ 8.  The Product is named "Greek Yogurt Vanilla Blended," displaying what Ms. Nacarino terms the "Vanilla Representations" on its container[1]: (1) the word "Vanilla," without qualifiers, on the front; (2) images of the vanilla flower and vanilla bean on all sides; and (3) the following text on the back:

> Carried from some far-off, exotic place, where a little flower became a little bean.  And that little bean, suspended and unremarkable, the cloak that conceals the magic within.  Flavor like perfume, folded up in earthen envelopes, rich and warm and wonderful.  *Entirely vanilla*, gently opening like the blossom that began it all.



---

[1] As Chobani notes in its motion to dismiss, the complaint does not clearly define the particular container size(s) that comprise "the Product," a pleading deficiency that is potentially important because the labeling on 5.3-ounce and 32-ounce containers of Chobani's vanilla yogurt evidently differed during the relevant period; most notably, only the 32-ounce version displayed the "poem" discussed below.  *See* Mot. at 4-6, 17-18.  Because the Court finds Ms. Nacarino's deceptive-advertising claims implausible as a matter of law even when the poem is considered, it need not resolve the parties' dispute over container sizes.



*Id.* ¶¶ 2-5 (emphasis added).  Ms. Nacarino relied on the Vanilla Representations in concluding that the Product's vanilla flavor comes "*exclusively* from ingredients derived from the vanilla plant, such as vanilla beans or vanilla extract," and in purchasing the Product.  *See id.* ¶¶ 6, 8 (emphasis in original).

"Despite the Vanilla Representations," however, "scientific testing" indicates "that the vanilla flavoring of the Product does not come exclusively from the vanilla plant."  *Id.* ¶ 4; *see also* Docket No. 26-1, Ex. A (comprising the test results).  Rather, a mass spectrometry analysis performed in March 2020 reveals that "the Product is spiked with" flavor enhancers such as vanillin,[2] which is detectable "in a significantly greater amount than [it] would be if it were only present as part of vanilla extract."  *Id.* ¶¶ 4, 38.  Additionally, "the testing did not detect other aromatic compounds that would exist if vanilla extract or other ingredients derived from the vanilla [plant were] the source of the vanillin found in the Product."  *Id.* ¶ 38.  In making these inferences, Ms. Nacarino compares the Product with two competitor yogurts whose "vanilla flavor comes exclusively from ingredients derived from the vanilla plant."  *See id.* ¶ 39.  The mass

---

[2] According to the complaint, mass spectrometry "analysis is the method laboratories typically rely on in determining the presence of vanilla flavor components, because it is capable of detecting trace levels of compounds and there is minimal to no degradation of compounds in the extraction and detection process."  SAC ¶ 37.  Vanillin is a chemical compound that can be derived from non-vanilla sources in addition to vanilla beans.  *See* Mot. at 14.

spectrometry testing showed that one of these yogurts, under the brand name Siggi's, contained vanillin "at a mere 0.2556 PPM compared to the Product's level of vanillin at 81.748 PPM." *Id.* ¶ 41. Testing on the Siggi's yogurt also "detected the presence of aromatic compounds associated with real vanilla that are not found in [Chobani's] Product." *Id.* Similarly, a yogurt under the brand name Oui "revealed vanillin . . . at 1.783 PPM, compared to the [Chobani] Product's level at 81.748 PPM, and detected the presence of various aromatic compounds associated with real vanilla that are not found in [Chobani's] Product." *Id.* ¶ 43. The mass spectrometry analysis thus implies that "the Product relies upon added vanillin to boost its vanilla flavor" in ways that competitor products flavored exclusively with the vanilla plant do not. *Id.* ¶ 44.

Ms. Nacarino contends that, by identifying the Product as a "vanilla" yogurt, "with no qualifiers," Chobani violates a U.S. Food and Drug Administration ("FDA") regulation, which requires that products flavored "in any part from non-vanilla plant sources" include the words "with other natural flavor" on their labels. *See id.* ¶¶ 16-19, 64 (citing 21 C.F.R. § 101.22(i)).

The complaint further alleges that the Product's labeling is misleading and deceptive for purposes of state consumer-protection laws. It asserts that the Product's label mimics that of the Siggi's and Oui yogurts—*i.e.*, "product[s] where the vanilla flavor comes exclusively from ingredients derived from the vanilla plant"—by displaying images of the vanilla flower and/or vanilla bean and identifying the Product's flavor as, simply, "vanilla." *See id.* ¶¶ 39-40, 42. The complaint also notes that these three yogurts are "similar[ly]" priced, which further suggests that the Product's flavors derive exclusively from the vanilla plant. *See id.* ¶¶ 2, 40, 42 (stating that the Product costs $1.49 on one website, while Siggi's costs $1.79 and Oui costs $1.69 on the same website). In contrast, "competing products that add non-vanilla plant flavorings" indicate as much "on the front of their products" and sell at cheaper prices. *See id.* ¶¶ 46-47 (stating that two of these yogurts cost $0.99 or $1.19 on the same website).

Ms. Nacarino also points to consumer survey results showing that "many consumers reasonably believe that the origin of the Product's vanilla flavor comes exclusively from ingredients derived from the vanilla plant" based on the Product's labeling. *Id.* ¶ 25. In an April 2021 survey conducted by counsel for Ms. Nacarino, 414 "consumers were shown the entirety of

the Product's label." *Id.* ¶¶ 26; Docket No. 26-2, Ex. B (comprising the survey results).  The survey participants were asked: "Does the packaging of the above pictured product convey to you that there are one or more ingredients in the product that give it vanilla flavor?"  SAC ¶ 27.  A total of 329 respondents, or 79.5% of all participants, answered "Yes."  *Id.* ¶¶ 27-28.  Those who answered "Yes" were then asked: "What does the packaging of the above pictured product convey to you about the origin of the vanilla flavor?"  *Id.* ¶ 29.  A total of 173 respondents, or 41.8% of all participants in the survey, chose the answer choice: "That it comes exclusively from ingredients derived from the vanilla plant, such as vanilla beans or vanilla extract."  *Id.* ¶¶ 29-30.  Ms. Nacarino thus concludes that "a significant portion of consumers can and do interpret the Product's label" as representing "specifically that the vanilla flavor comes exclusively from ingredients derived from the vanilla plant, such as vanilla beans or vanilla extract."  *Id.* ¶ 31.  She also suggests that this result is consistent with "the common meaning of 'Vanilla' as a flavor from the vanilla plant," citing dictionary definitions "that expressly connect the word 'vanilla' with the plant."  *Id.* ¶¶ 32-35.

The complaint avers that Ms. Nacarino "would not have purchased the Product at a premium price or bought the Product at all" had she known that "the vanilla flavor of the Product [wa]s not exclusively from ingredients derived from the vanilla plant."  *See* SAC ¶ 8, 50-51.  She alleges that she would purchase the Product again, however, "if [it] were reformulated such that the vanilla flavor came exclusively from ingredients derived from the vanilla plant or the Product were not deceptively labeled."  *Id.* ¶ 9.

This case was brought on behalf of Ms. Nacarino and a putative class of "[a]ll persons in California who purchased the Product from October 23, 2016[,] to the date of judgment."  *Id.* ¶ 54. The complaint asserts four causes of action, including one claim under the "unlawful" prong of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; one claim under the "unfair" and "fraudulent" prongs of the UCL; one claim under California's False Advertising Law ("FAL"), Cal. Bus. and Prof. Code § 17500 *et seq.*; and one claim under California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*  *See* SAC ¶¶ 62-98.

1     Ms. Nacarino requests various forms of legal and equitable relief, namely damages under

2 the CLRA, "an order enjoining [Chobani] from continuing to conduct business through unlawful

3 acts and practices and to commence a corrective advertising campaign" under the UCL and FAL,

4 and "disgorgement and restitution of all monies from the sale of [Chobani's] Products that were

5 unjustly acquired" under the unlawful prong of the UCL. *See id.* ¶¶ 69-71, 78, 85, 93, 97, Prayer

6 for Relief.

7     Ms. Nacarino filed her original complaint on October 23, 2020, and an amended complaint

8 on January 26, 2021. *See* Docket Nos. 1, 21. Chobani moved to dismiss the amended complaint

9 on March 26, 2021. *See* Docket No. 23. Ms. Nacarino then filed the instant Second Amended

10 Complaint on April 16, 2021, which Chobani moved to dismiss on May 14, 2021. *See* SAC, Mot.

### III.     LEGAL STANDARD

12     Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

13 statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A

14 complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

15 Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss

16 after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic*

17 *Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must

18 . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765

19 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true

20 and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St.*

21 *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a

22 complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

23 allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

24 effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial

25 plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

26 inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The

27 plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

28 possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

United States District Court
Northern District of California

1         Claims sounding in fraud are also subject to the heightened pleading requirements of

2    Federal Rule of Civil Procedure 9(b), which requires a plaintiff bringing such a claim to "state

3    with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To

4    satisfy the heightened standard of Rule 9(b), a plaintiff must identify the ''who, what, when,

5    where, and how'' of the alleged misconduct and explain how the statement or omission

6    complained of was false or misleading.  *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th

7    Cir. 2003).  The purpose of Rule 9(b) is to require that a plaintiff's allegations be "specific enough

8    to give defendants notice of the particular misconduct which is alleged . . . so that they can defend

9    against the charge and not just deny that they have done anything wrong."  *Swartz v. KPMG LLP*,

10   476 F.3d 756, 764 (9th Cir. 2007).  Rule 9(b) allows, however, that "[m]alice, intent, knowledge,

11   and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

12        Where a court dismisses a complaint, it "should grant leave to amend . . . unless it

13   determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez*

14   *v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In making this determination, the court should

15   consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive,

16   repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing

17   party[,] and futility of the proposed amendment."  *See Moore v. Kayport Package Express*, 885

18   F.2d 531, 538 (9th Cir. 1989) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

19   **IV.**    <u>**DISCUSSION**</u>

20        This case is one of many recent putative class actions targeting allegedly deceptive

21   labeling on vanilla food products that are not flavored, either exclusively or in significant part,

22   with vanilla extract or vanilla bean.  *See, e.g.*, *Clark v. Westbrae Natural, Inc.*, 2020 WL 7043879

23   (N.D. Cal. Dec. 1, 2020) ("*Clark I*"); *Cosgrove v. Blue Diamond Growers*, 2020 WL 7211218

24   (S.D.N.Y. Dec. 7, 2020); *Zaback v. Kellogg Sales Co.*, 2020 WL 6381987 (S.D. Cal. Oct. 29,

25   2020).  Many plaintiffs have focused on manufacturers' use of the term "vanilla" on product

26   labels.  *See, e.g.*, *Clark I*, 2020 WL 7043879; *Cosgrove*, 2020 WL 7211218; *Pichardo v. Only*

27   *What You Need, Inc.*, 2020 WL 6323775 (S.D.N.Y. Oct. 27, 2020).  In asserting the more extreme

28   contention that the labeling here implies flavoring comes *exclusively* from vanilla extract or

United States District Court<br>Northern District of California

7

vanilla bean, Ms. Nacarino relies not only on the Product's invocation of "Vanilla" on its packaging but also its prominent vanilla plant imagery and the aforementioned "poetic" vignette. *See* Opp'n at 19.  This Court concludes that Ms. Nacarino has failed to state a claim under the unfair and fraudulent prongs of the UCL, the FAL, or the CLRA.  She has, however, plausibly alleged a predicate violation of 21 C.F.R. § 101.22(i) for purposes of the UCL's unlawful prong and may proceed with that claim alone.

A.      Deception Claims

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue[,] or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  As noted above, Ms. Nacarino has brought consumer deception claims under the "unlawful" and "unfair and fraudulent" prongs of the UCL.  *See* SAC ¶¶ 62–86.  The FAL similarly prohibits "untrue or misleading" advertising "which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading," Cal. Bus. & Prof. Code § 17500, and the CLRA prohibits "'unfair methods of competition and unfair or deceptive acts or practices' in transactions for the sale or lease of goods to consumers."  *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 833 (2006) (quoting Cal. Civ. Code § 1770(a)).  Consumer deception claims under the UCL, FAL, and CLRA must satisfy the "reasonable consumer" standard to survive a motion to dismiss pursuant to Rule 12(b)(6).  *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (citing *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995)).

The reasonable consumer standard requires that "members of the public are likely to be deceived" by the pertinent advertising.  *See Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016).  This standard in turn "requires more than a mere possibility" that the statement at issue "might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner."  *Id.* (internal quotation omitted).  "Rather, the reasonable consumer standard requires a probability 'that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.'"  *Id.* (quoting *Lavie v. Procter & Gamble Co.*, 165 Cal. App. 4th 496, 508 (2003)).  California district and state courts have recognized that whether a reasonable consumer would be misled is generally a question of fact not

1   amenable to determination on a motion to dismiss but that the factual allegations may fail as a

2   matter of law. *See Williams*, 552 F.3d at 938-39; *Robie v. Trader Joe's Co.*, 2021 WL 2548960, at

3   *5 (N.D. Cal. June 14, 2021); *Shaeffer v. Califia Farms, LLC*, 44 Cal. App. 5th 1125, 1140

4   (2020).

5       Here, Ms. Nacarino's complaint fails to state a deceptive labeling claim as a matter of law.

6   While a reasonable consumer might believe that the Product contains some vanilla extract, Ms.

7   Nacarino's more extreme claim—that such a consumer would believe that the Product's vanilla

8   flavor derives *entirely* from the vanilla plant—is implausible under the facts presented here.

9       1.   <u>Vanilla Representations</u>

10      Federal courts have repeatedly rejected the theory that reasonable consumers would

11  interpret the word "vanilla," without qualifiers, on a product label to indicate that a product's

12  vanilla flavoring comes *exclusively* from the vanilla plant. *See, e.g.*, *Clark v. Westbrae Natural,*

13  *Inc.*, 2021 WL 1580827 (N.D. Cal. Apr. 22, 2021) ("*Clark II*"), *appeal filed*, No. 21-15749 (9th

14  Cir. Apr. 27, 2021); *Cosgrove*, 2020 WL 7211218; *Pichardo*, 2020 WL 6323775. For example, in

15  *Clark II*, the plaintiff alleged that the packaging on a vanilla soymilk carton using the word

16  "Vanilla" led him to believe that the soymilk's flavor came exclusively from the vanilla plant. *See*

17  2021 WL 1580827, at *1. The court held that a reasonable consumer would not interpret "the bald

18  word 'vanilla'" to mean that the product's vanilla flavor came exclusively from vanilla bean, since

19  "nothing about the word 'vanilla' itself . . . suggests to the reasonable consumer that the flavor

20  comes *exclusively* from the vanilla bean." *See id.* at *2–3 (emphasis in original) (citing *Twohig v.*

21  *Shop-Rite Supermarkets, Inc.*, 2021 WL 518021, at *3 (S.D.N.Y. Feb. 11, 2021) (concluding that

22  a reasonable consumer would understand that "vanilla" is "merely a flavor designator")).

23  Likewise, *Cosgrove* determined that the word "vanilla," without "additional language modifiers"

24  such as "made with vanilla extract," only indicated flavor to the reasonable consumer. *See* 2020

25  WL 7211218, at *3. Moreover, the court held that no reasonable consumer would expect that an

26  almond milk product merely labeled "vanilla" would be flavored exclusively with vanilla extract,

27  since the purpose of "vanilla" on the label is chiefly to help consumers in grocery stores searching

28  for almond milk "quickly understand the flavor . . . and differentiate between products." *See id.* at

9

1    *3–4; *see also Pichardo*, 2020 WL 6323775 at *4 (holding that no reasonable consumer would

2    expect a product not "clarifying the source of the vanilla" to be flavored exclusively with vanilla

3    extract, when vanilla products are not customarily "divided into those that are flavored exclusively

4    with vanilla extract and those that are not").

5          In this case, there is nothing about the word "Vanilla" on the Product's label that suggests

6    it is flavored with vanilla bean or extract, let alone *exclusively* with vanilla bean or extract, and its

7    label displays no "additional language modifiers," such as "vanilla extract" or "made with vanilla

8    extract," that might suggest otherwise. *See Clark II*, 2021 WL 1580827 at *2–3; *Cosgrove*, 2020

9    WL 7211218 at *3–4. This Court therefore joins the many other courts that have considered this

10   issue and concluded that the term "vanilla" on vanilla-flavored products merely indicates flavor

11   and not an ingredient source. The label "vanilla" most commonly denotes the flavor of the

12   product, distinguishing it from, *e.g.*, "Banana" or "Coconut." As a result, Ms. Nacarino's

13   assertion—that the "bald" word "Vanilla" renders the Product's advertising misleading because it

14   suggests that it is exclusively flavored from the vanilla plant—is unavailing.

15         Ms. Nacarino's similarly alleges that the Product's conspicuous vanilla imagery and poetic

16   vignette suggest more than its general flavor—*i.e.*, that the Product's flavor derives exclusively

17   from the vanilla plant. First, Ms. Nacarino asserts that since the Product "prominently displays

18   multiple images of vanilla flower[s] and vanilla beans all over its packaging," the imagery would

19   deceive a reasonable consumer into believing that the Product's vanilla flavor comes exclusively

20   from vanilla extract. *See* Opp'n at 19. While the imagery may suggest that at least some of the

21   Product's flavor is derived from vanilla bean or extract, it in no way implies that they are the

22   *exclusive* flavor source. Courts have repeatedly rejected similar claims. For instance, in *Kennedy

23   v. Mondelez Global LLC*, the court held that a graham cracker's labeling, featuring a bee and

24   honey dipper and stating "made with real honey," would not deceive the reasonable consumer into

25   believing that honey was the product's *exclusive* sweetener because the labeling "do[es] not state

26   anywhere that honey is the only [sweetener]." *See* 2020 WL 4006197, at *12 (E.D.N.Y. July 10,

27   2020); *see also Lima v. Post Consumer Brands, LLC*, 2019 WL 3802885, at *7 (D. Mass. Aug. 13,

28   2019) (holding that a reasonable consumer would not believe honey to be the exclusive sweetener

United States District Court
Northern District of California

10

in cereal, despite images of a honey dipper and bee, as the packaging made "no objective

representation about the amount of honey" in the product); *Budhani v. Monster Energy Co.*, 2021

WL 1104988, at *6, *8 (S.D.N.Y. Mar. 22, 2021) (holding that an energy drink with a vanilla

flower image below the words "Vanilla Cream" would not lead a reasonable consumer to conclude

that vanilla bean was the product's exclusive or even predominant vanilla flavor source, as the

labeling "ma[de] no representation" about the "quantity of [vanilla extract] compared to other

flavoring compounds").  *Cf. Tucker v. Post Consumer Brands, LLC*, 2020 WL 1929368, at *5

(N.D. Cal. Apr. 21, 2020) (finding that a cereal package displaying "prominent honey-related

words and imagery" could lead a reasonable consumer to believe that the cereal had *relatively*

more honey than refined sweetener).  Taken together, these cases suggest that imagery associated

with a natural ingredient, even where prominently displayed, does not affirmatively convey to a

reasonable consumer that the ingredient is a product's exclusive flavor source.

Here, no reasonable consumer would take the Product's vanilla imagery, even if

"prominent" and displayed "all over [the] packaging," Opp'n at 19, as indicating that the yogurt's

flavor is derived exclusively from the vanilla plant.  Just as featuring bee-and-honey-dipper

imagery on a graham cracker label is not akin to stating that honey is the cracker's only sweetener,

the mere presence of vanilla imagery on the yogurt's label does not communicate that vanilla

extract is the Product's sole source of vanilla flavor.  *See Kennedy*, 2020 WL 4006197 at *12.

Next, Ms. Nacarino alleges that since the poetic vignette contains the phrase "entirely

vanilla," a reasonable consumer would believe the Product to be flavored "entirely" from the

vanilla plant.  *See* Opp'n at 19.  However, her explanation is implausible because she takes

"entirely vanilla" out of the context.  *See* Reply at 10–11.  The vignette states:

> Carried from some far-off, exotic place, where a little flower became
> a little bean.  And that little bean, suspended and unremarkable, the
> cloak that conceals the magic within.  Flavor like perfume, folded up
> in earthen envelopes, rich and warm and wonderful.  *Entirely*
> *vanilla*, gently opening like the blossom that began it all.

SAC ¶ 3 (emphasis added).  Read in its entirety and granting its impressionistic quality, the

vignette suggests, if anything, that the words "entirely vanilla" refer not to the Product but to the

vanilla bean itself.  The subject of the vignette is the vanilla bean, and the vignette makes no

United States District Court
Northern District of California

1    express claims about the Product's flavoring whatsoever.  *See id.*  No reasonable consumer would

2    believe, therefore, that the Product relies exclusively on the vanilla plant for its flavor based on the

3    mere phrase "entirely vanilla" as used in the vignette.  *See Freeman*, 68 F.3d at 290 (holding that

4    consumer deception claims may be dismissed where inferences are unreasonable in the context of

5    the entire advertisement).

6              2.    Ingredient List

7         Additionally, the Product's ingredient list strongly suggests to the reasonable consumer

8    that the Product contains flavoring ingredients other than those derived exclusively from the

9    vanilla plant.  As the reproduction included above indicates, the Product's label lists the following

10   ingredients:

11              Nonfat yogurt (cultured pasteurized nonfat milk), cane sugar, water,
               fruit pectin, *natural flavors*, vanilla extract, guar gum, lemon juice
12              concentrate.

13   *See* SAC ¶ 5 (emphasis added).  The fact that "natural flavors" appears among the ingredients of a

14   vanilla-flavored yogurt, and that "natural flavors" is adjacent to "vanilla extract," would alert a

15   reasonable consumer to the likelihood that vanilla extract is not the exclusive source of vanilla

16   flavoring in the yogurt.  Although Ms. Nacarino's counsel asserted at the motion hearing that

17   "natural flavors" may refer to non-flavor-related features, such as texture and mouthfeel, this

18   argument is unpersuasive.  Counsel's suggestion is simply not a natural reading of "natural

19   flavors" to the typical consumer.  The Product's ingredient list therefore further undermines Ms.

20   Nacarino's deceptive labeling claims.

21        To be sure, reasonable consumers are not required to test front-label representations by

22   examining the fine print in the ingredient list.  *See Williams*, 552 F.3d at 939 (holding that the

23   FDA did not "require[] an ingredient list so that manufacturers can mislead consumers and then

24   rely on the ingredient list to correct those misinterpretations and provide a shield for liability for

25   the deception"); *Moore v. Trader Joe's Co.*, --- F.4th ---, 2021 WL 2965445, at *5 (9th Cir. July

26   15, 2021) (holding that where "deceptive advertisements . . . intentionally use ambiguity to

27   mislead consumers while maintaining some level of deniability" through ingredient list

28   disclosures, plausible consumer deception claims may arise).  However, since Ms. Nacarino's

United States District Court
Northern District of California

1    claims rely on the totality of the Product's packaging, including the poetic vignette on the back of

2    the Product that is located next to the ingredient list, the list is relevant to evaluating her claim that

3    the Product suggests that it is flavored entirely with vanilla bean or extract.  *See Williams*, 552

4    F.3d at 939 n.3 (evaluating the context of the packaging "as a whole"); *Moore v. Mars Petcare*

5    *US, Inc.*, 966 F.3d 1007, 1017 (9th Cir. 2020) (holding that a back-label ingredient list, while

6    unable to "defeat" claims of consumer deception where the list conflicts with front-label

7    representations, "can [still] ameliorate any tendency of the label to mislead").

8              3.        Cases Finding Plausible Exclusive Ingredient Claims

9              Further, Ms. Nacarino's allegations are distinguishable from those where courts have

10   found that a product plausibly misrepresented that a certain ingredient was exclusive.  For

11   example, in *Wilson v. Frito-Lay North America, Inc.*, the court found that a reasonable consumer

12   would expect a bag of potato chips to consist of exclusively natural ingredients where the bag

13   stated "Made with ALL NATURAL Ingredients."  *See* 2013 WL 1320468, at *13 (N.D. Cal. Apr.

14   1, 2013); *see also Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188, 1191 (N.D. Cal. 2014)

15   (holding that an "All Natural" label was misleading because waffles contained synthetic

16   substances).  Likewise, in *Reynolds v. Wal-Mart Stores, Inc.*, the court held that a reasonable

17   consumer would interpret a juice blend to consist of only cranberry and pomegranate juices where

18   the label stated "100%" close to and in the same-size type as the words "Cranberry Pomegranate."

19   *See* 2015 WL 1879615, at *1, *5 (N.D. Fla. Apr. 23, 2015).  In contrast, in *Kennedy*, the court

20   held that no reasonable consumer would be deceived into thinking that honey was the only

21   sweetener in graham crackers because the labeling nowhere "state[d]" that honey was the

22   crackers' only sweetener.  *See* 2020 WL 4006197 at *12.  These cases demonstrate that for a

23   reasonable consumer to believe that an ingredient is the *exclusive* source of flavoring in a product,

24   the product's labeling must contain statements or other expressive content explicitly stating or

25   clearly implying as much.  Here, the Product nowhere asserts that it is, *e.g.*, "made with all-natural

26   vanilla" or "100%" vanilla, nor displays any other statements even arguably conveying that vanilla

27   bean or extract is the exclusive source of its vanilla flavor.  *See* SAC ¶¶ 2, 3, 5.  This case is thus

28   easily distinguished from those where courts have held that plaintiffs stated a consumer deception

United States District Court
Northern District of California

13

1    claim based on the purported exclusivity of a particular ingredient.

2              4.    Survey

3         Additionally, Ms. Nacarino's survey cannot save her otherwise implausible claims.  In

4    *Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225 (9th Cir. 2019), the Ninth Circuit dismissed a

5    plaintiff's deceptive advertising claims, finding that a reasonable consumer would not believe that

6    the term "diet" in "Diet Dr Pepper" implies that the soft drink "promises weight loss or weight

7    management"; instead, "the use of 'diet' in a soft drink's brand name is understood as a relative

8    claim about the calorie content of that soft drink compared to the same brand's 'regular' (full-

9    caloric) option."  *See id.* at 1229.  The *Becerra* court further held that the plaintiff's survey, which

10   purportedly showed that most respondents expected diet soft drinks "to either help them lose

11   weight, or help maintain or not affect their weight," could not, "on its own, salvage [her] claim[s]"

12   given that "a reasonable consumer would still understand 'diet' in this context to be a relative

13   claim about the calorie or sugar content of the product."  *Id.* at 1230-31.  The Ninth Circuit thus

14   concluded that the survey, even when its allegations were accepted as true for purposes of a

15   motion to dismiss, did not "shift the prevailing reasonable understanding of what reasonable

16   consumers understand the word 'diet' to mean or make plausible the allegation that reasonable

17   consumers are misled by the term 'diet.'"  *Id.* at 1231; *see also Hawyuan Yu v. Dr Pepper Snapple

18   Grp., Inc.*, 2020 WL 5910071, at *7 (N.D. Cal. Oct. 6, 2020) (finding that a survey could not save

19   an already implausible consumer deception claim, especially where the survey was only

20   "tangentially related" to the claim).

21        Courts in this district have interpreted *Becerra* to hold that consumer deception claims that

22   are otherwise facially implausible cannot be redeemed merely by surveys.  *See Tucker*, 2020 WL

23   1929368 at *5 (citing *Becerra* and holding that plaintiff's survey "cannot, on its own, satisfy the

24   reasonable consumer test"); *Hawyuan Yu*, 2020 WL 5910071, at *4 (stating that *Becerra* held that

25   a plaintiff "cannot rely on consumer surveys alone" to make plausible an otherwise implausible

26   claim); *Clark II*, 2021 WL 1580827 at *3 (citing *Becerra* and stating that plaintiff's survey "does

27   not shift the prevailing . . . understanding" of what reasonable consumers understand).

28

United States District Court
Northern District of California

1    Thus, although Ms. Nacarino's survey supports her deceptive labeling claims,[3] it cannot

2    rescue her claims from the zone of implausibility where implausibility is otherwise so clear.

3    Accordingly, the Court **GRANTS** Chobani's motion to dismiss Ms. Nacarino's deceptive

4    labeling claims under the unfair and fraudulent prongs of the UCL, the FAL, and the CLRA.  The

5    Court need not reach the additional issues raised in Chobani's motion regarding particularity in

6    pleading, standing for injunctive relief, and the adequacy of available legal remedies with respect

7    to these claims.  Since the Court concludes that further amendment would be futile, given the

8    manifest implausibility of her deceptive labeling claims, Ms. Nacarino is not given leave to

9    amend.  *See Moore*, 885 F.2d at 538.

10   **B.**   <u>Federal Violation Under UCL Unlawful Prong</u>

11   The Court next considers whether Ms. Nacarino has plausibly pled that the Product does

12   not comply with 21 C.F.R. § 101.22(i) and thus violates the UCL's unlawful prong.[4]  The UCL

13   prohibits business acts or practices that are "unlawful."  Cal. Bus. & Prof. Code § 17200.  As the

14   California Supreme Court has explained, the unlawful prong of the UCL "borrows violations of

15   other laws and treats [them] . . . as unlawful practices independently actionable under section

16   17200 et seq. and subject to the distinct remedies provided thereunder."  *Farmers Ins. Exch.*

17   *v. Superior Court*, 2 Cal.4th 377, 383 (1992) (internal quotation omitted).  "Virtually any law can

18   serve as the predicate for a section 17200 action."  *Klein v. Earth Elements, Inc.*, 59 Cal. App. 4th

19   965, 969 (1997).

20   Section 101.22(i)(1)(iii) states:

21           If [a] food contains both a characterizing flavor from the product
             whose flavor is simulated and other natural flavor which simulates,
22           resembles or reinforces the characterizing flavor, the food shall be

23

24   ---

[3] Chobani argues that the survey's ostensibly flawed methodology (*e.g.*, its leading questions, poor
presentation of answer choices, and lack of control group) should lead the Court to discount it.
25   *See* Mot. at 15-16, Reply at 8-9.  However, evaluating the quality of a plaintiff's evidence is
inappropriate at this stage of the litigation.  *See Jones v. Johnson*, 781 F.2d 769, 771 n.1 (9th Cir.
26   1986) ("[A]ny weighing of evidence is inappropriate on a 12(b)(6) motion."), *overruled on other
grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

27   [4] Ms. Nacarino also alleges that Chobani violates the California Sherman Food, Drug, and
Cosmetic Law, Cal. Health & Saf. Code § 109875 *et seq.*, which adopts all FDA regulations as
28   parallel state regulations.  *See* SAC ¶ 66, Cal. Health & Safety Code § 110100.

United States District Court
Northern District of California

> labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section and the name of the food shall be immediately followed by the words "with other natural flavor" in letters not less than one-half the height of the letters used in the name of the characterizing flavor.

21 C.F.R. § 101.22(i)(1)(iii).  The regulation thus requires that if the Product, whose "characterizing flavor" is vanilla, does not rely exclusively on the vanilla plant for its vanilla flavor, and instead also relies on "other natural flavor[s]," the Product's label must include the words "with other natural flavor" in addition to "Vanilla."  *See* SAC ¶¶ 16-19, 65.

The Court finds that Ms. Nacarino has adequately alleged that the Product does not comply with Section 101.22(i), as she asserts that the Product's flavoring does not derive exclusively from the vanilla plant and that its label does not include "with other natural flavor" in compliance with the prescriptive terms of Section 101.22(i)(1)(iii).  As alleged in the complaint, mass spectrometry testing revealed that "aromatic compounds associated with real vanilla . . . are not found in [Chobani's] Product," while such compounds *are* found in competitor products whose flavor comes entirely from vanilla bean or extract.  *See id.* ¶¶ 36-43.  Further, the complaint states that vanillin levels in the Product were over 45 times as high as those in one of the competitor products, and over 319 times as high as those in the other, leading Ms. Nacarino to conclude that the Product's vanillin is present "in a significantly greater amount than would be if it were only present as part of vanilla extract."  *See id.*, Opp'n at 22.  Given the allegedly stark differences in testing results between the Product and competitor products flavored exclusively with vanilla bean or extract, Ms. Nacarino has plausibly pled that the Product is not exclusively flavored with "real" vanilla.  This conclusion is further supported by the fact that the Product's ingredient list expressly states that the Product contains "natural flavors" in addition to "vanilla extract."  *Supra* Part IV.A.2.  Since the Product's label only includes the term "Vanilla," Ms. Nacarino has adequately alleged that the Product does not comply with Section 101.22(i)(1)(iii).

Chobani contends that Ms. Nacarino cannot prove that the Product is not exclusively flavored from the vanilla plant, since the testing does not identify the source of the Product's vanillin and vanillin can be derived from the vanilla plant.  *See* Mot. at 12-14, Reply at 7, 12.  But the legal standard for a Rule 12(b)(6) challenge is plausibility and the Court must draw all

1  reasonable inferences in the nonmoving party's favor on a motion to dismiss.  *See Pelletier v. Fed.*

2  *Home Loan Bank of S.F.*, 968 F.2d 865, 872 (9th Cir. 1992).  The marked differences in vanillin

3  levels between the Product and competitor yogurts plausibly imply that the Product's vanillin does

4  not come solely from the vanilla plant.  The cases that Chobani relies on, moreover, are

5  distinguishable.  *See* Reply at 18.  In *Clark II* and *Fahey v. Whole Foods Market, Inc.*, 2021 WL

6  2816919 (N.D. Cal. June 30, 2021), plaintiffs likewise alleged that the vanilla flavor in the

7  disputed products was not derived solely from the vanilla plant based on mass spectrometry

8  testing results.  *See Clark II*, 2021 WL 1580827 at *1; *Fahey*, 2021 WL 2816919, at *6.

9  However, unlike Ms. Nacarino, those plaintiffs only tested the disputed products, with no other

10  products for comparison, enabling them only to show that the disputed products' vanillin levels

11  were high.  *See Clark II*, 2021 WL 1580827, at *5 (holding that plaintiff had "no good faith basis"

12  for alleging that vanillin was not from the vanilla bean where testing only showed that vanillin

13  was prominent); *Fahey*, 2021 WL 2816919, at *6 (finding mere allegation that "Product has an

14  excess of vanillin" insufficient to support allegation that vanillin came from unnatural sources).

15       Here, the differences in aromatic compound levels and the disparity among vanillin levels

16  between the Product and competitor yogurts provide an adequate factual basis for Ms. Nacarino to

17  state a plausible federal violation and resultant claim under the UCL's unlawful prong.[5]

18       The Court therefore **DENIES** Chobani's motion to dismiss with respect to Ms. Nacarino's

19  claim under the UCL's unlawful prong.

20  C.    <u>Preemption</u>

21       The Court also finds that Ms. Nacarino's claim under the UCL's unlawful prong is not

22  preempted.  Federal law preempts state law when a state law confers rights or imposes obligations

23

24  [5] Although Ms. Nacarino has stated a plausible violation of 21 C.F.R. § 101.22(i), she may not use

25  that violation alone as the basis for her deceptive labeling claims, which implicate the reasonable
   consumer test.  *See* Opp'n at 20-21 (arguing that the federal labeling violation supports her

26  deception claims).  *Cf. Garadi v. Mars Wrigley Confectionery*, 2021 WL 2843137, at *3
   (E.D.N.Y. July 6, 2021) (holding that regulation enforcement lies "solely within the purview of

27  the [FDA]"); *Steele v. Wegmans Food Mkts., Inc.*, 472 F. Supp. 3d 47, 49-50 (S.D.N.Y. 2020)
   (holding that FDA regulation compliance is irrelevant to deception claims because FDA

28  enforcement is reserved for federal and state authorities); *Pichardo*, 2020 WL 6323775, at *3 n.6
   (same).

United States District Court
Northern District of California

that would conflict with a related federal law.  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S.

Ct. 1461, 1480 (2018).  Chobani argues that insofar as Ms. Nacarino has not plausibly alleged a

federal violation under 21 C.F.R. § 101.22(i), any additional demand that Chobani alter its

labeling pursuant to the UCL is preempted by that same federal regulation.  *See* Motion at 28-29,

Reply at 18.  However, as stated above, Ms. Nacarino has plausibly alleged a violation of 21

C.F.R. § 101.22(i).  Further, Ms. Nacarino's claim under the UCL's unlawful prong is not

preempted for any other reason since she only seeks to enforce the federal regulation and does not

contend that Chobani should label the Product in a manner different from what the federal

regulation already requires.  *See* SAC ¶¶ 8, 16-19; *cf. Chacanaca v. Quaker Oats Co.*, 752 F.

Supp. 2d 1111, 1115, 1119-21 (N.D. Cal. 2010) (finding preemption where a plaintiff requested

that a company remove a statement describing granola bars as containing zero grams of trans-fats

where federal law allowed manufacturers to round down to zero grams for trans-fats not exceeding

0.5 grams).

       The Court therefore **DENIES** Chobani's motion to dismiss Ms. Nacarino's claim under the

UCL's unlawful prong on the grounds that the claim is preempted by federal law.

D.    <u>Standing for Injunctive Relief</u>

       The Court further finds that Ms. Nacarino has standing to seek injunctive relief, albeit

solely with respect to her claim under the UCL's unlawful prong.  To survive a challenge to a

plaintiff's Article III standing under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears

the burden of showing that her injury-in-fact is "concrete, particularized, and actual or imminent,"

rather than "conjectural or hypothetical"; that it is "fairly traceable to the challenged action"; and

that it is "redressable by a favorable ruling."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S.

139, 149 (2010); *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018).  In

conducting a standing inquiry, the court must accept the plaintiff's factual allegations as true and

draw all reasonable inferences in her favor without reaching the merits of her claim.  *Maya*

*v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011); *Vizcarra v. Unilever U.S., Inc.*, 2020 WL

4016810, at *5 (N.D. Cal. July 16, 2020).  When seeking injunctive relief, the injury-in-fact

requirement is met when the consumer alleges that she (1) cannot "rely on the product's

United States District Court
Northern District of California

United States District Court
Northern District of California

1  advertising or labeling in the future, and so will not purchase the product although she would like

2  to" or (2) might purchase the product again, "as she may reasonably, but incorrectly, assume the

3  product was improved."  *Davidson*, 889 F.3d at 969-70.

4       Here, Ms. Nacarino has standing to pursue injunctive relief under *Davidson*'s first

5  scenario, as she has alleged that she cannot rely on the Product's advertising or labeling, and that

6  she will not purchase the Product again despite her desire to.  Specifically, Ms. Nacarino alleges

7  that she "*would purchase the Product again in the future* if the Product were reformulated such

8  that the vanilla flavor came exclusively from ingredients derived from the vanilla plant or the

9  Product were not deceptively labeled."  SAC ¶ 9 (emphasis added).[6]

10      Chobani argues that Ms. Nacarino has not alleged an "actual or imminent" threat of harm

11 "because she has alleged only a *conditional* desire to purchase the Yogurt Product in the future."

12 *See* Mot. at 20 (emphasis added).  The Court finds that this argument effectively ignores

13 *Davidson*.  Every consumer who satisfies *Davidson*'s first scenario would purchase the contested

14 product only "if" it changed in some way.  *See Davidson*, 889 F.3d at 969–70; *see also Vizcarra*,

15 2020 WL 4016810 at *6 (finding that the plaintiff had standing where she alleged that she would

16 purchase an ice cream product again "if it were truly flavored as labeled and advertised"); *cf.*

17 *Lanovaz v. Twinings N. Am., Inc.*, 726 Fed. Appx. 590, 591 (9th Cir. 2018) (finding that a plaintiff

18 lacked standing where she only alleged that she would "consider buying" a product again).

19      Accordingly, the Court **DENIES** Chobani's motion to dismiss Ms. Nacarino's request for

20 injunctive relief on standing grounds.

21 E.    Ability to Pursue Equitable Relief

22      Finally, the Court determines that Ms. Nacarino may pursue only some of the equitable

23 remedies that she requests under the UCL's unlawful prong, as she lacks an adequate remedy at

24 law with respect to her request for injunctive relief but not her request for equitable restitution.  "A

25 UCL action is an equitable action by means of which a plaintiff" may not recover damages.

26

27 [6] The Court does not reach the merits of whether the Product was in fact "deceptively labeled" here.  *See Maya*, 658 F.3d at 1068.  As Ms. Nacarino does not plausibly allege that the Product
28 was deceptively labeled, the Court need not address her standing to bring claims under the UCL's unfair and fraudulent prongs, the FLA, or the CLRA.

*Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal.4th 163, 173 (2000). "Prevailing plaintiffs are generally limited to injunctive relief and restitution." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 179 (1999). Accordingly, Ms. Nacarino seeks, pursuant to the UCL's unlawful prong, (1) "an order enjoining [Chobani] from continuing to conduct business through unlawful acts and practices and to commence a corrective advertising campaign" and (2) "an order for the disgorgement and restitution of all monies from the sale of [Chobani's] Products that were unjustly acquired." *See* SAC ¶¶ 69-70. While Ms. Nacarino does not seek damages under this claim, she does seek damages with respect to her unavailing CLRA claim. *See id.* ¶ 97. In its motion, Chobani contends that Ms. Nacarino's "equitable claims must be dismissed because she does not and cannot allege that she lacks an adequate remedy at law." Mot. at 22-23, Reply at 14-15.

Chobani's argument is based on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), in which the Ninth Circuit held that "the traditional principles governing equitable remedies in federal courts, including the requisite inadequacy of legal remedies, apply when a party requests restitution under the UCL . . . in a diversity action." *Id.* at 844. In that case, a plaintiff brought claims for deceptive advertising under the UCL and CLRA, seeking damages (under the CLRA) as well as injunctive relief and equitable restitution (under both statutes). *Id.* at 837-38. On the eve of trial, she voluntarily dismissed her CLRA "damages claim and chose to proceed with only" her "claims for restitution and injunctive relief," as she desired a bench rather than a jury trial. *Id.* at 837. The plaintiff nevertheless continued to seek the same amount of money on behalf of the class she represented "but as equitable restitution rather than damages." *Id.* The defendant moved to dismiss, asserting that she "failed to state viable claims for restitution because an adequate legal remedy—damages—was available for that injury." *Id.* at 838. On appeal, the Ninth Circuit ruled that "a federal court must apply traditional equitable principles before awarding restitution under the UCL and CLRA," *id.* at 841 (citing, *e.g.*, *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 105-06 (1945)), and that these principles require a plaintiff "to establish that she lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL and CLRA," *id.* at 844. The Ninth Circuit went on to hold that the plaintiff

1    failed to do so because she did "not allege that [she] lack[ed] an adequate legal remedy" and could

2    not "explain how the same amount of money for the exact same harm [was] inadequate or

3    incomplete" to compensate her for the alleged harms.  *Id.*  The *Sonner* court thus affirmed the

4    district court's dismissal of her restitution claims.  *Id.* at 845.

5           Chobani's motion raises two questions based on the inadequate-remedy-at-law doctrine:

6    (1) whether Ms. Nacarino's claim for injunctive relief must be dismissed and (2) whether her

7    claim for restitution (or disgorgement) must be dismissed.  Regarding the first question, Ms.

8    Nacarino argues that "*Sonner* does not bar consumer fraud claims that seek injunctive relief where

9    the plaintiff, as here, allege[s] future harms."  Opp'n at 24.  Indeed, the Ninth Circuit expressly

10   observed that "[i]njunctive relief [was] not at issue" in *Sonner* because the defendant only moved

11   to dismiss the plaintiff's claims for restitution.  *See* 971 F.3d at 842.  While "numerous courts in

12   this circuit have applied *Sonner* to injunctive relief claims" and have thus required plaintiffs "to

13   allege that they lack an adequate remedy at law in order to seek injunctive relief," *see In re

14   MacBook Keyboard Litig.*, 2020 WL 6047253, at *3 (N.D. Cal. Oct. 13, 2020), courts have rightly

15   emphasized that "retrospective damages are not an adequate remedy for th[e] prospective harm"

16   that injunctions are designed to prevent, *see Zeiger v. WellPet LLC*, --- F. Supp. 3d ---, 2021 WL

17   756109, at *21 (N.D. Cal. Feb. 26, 2021); *see also Andino v. Apple, Inc.*, 2021 WL 1549667, at *5

18   (E.D. Cal. Apr. 20, 2021) (holding that "[m]oney damages are an inadequate remedy for future

19   harm, as they will not prevent Defendant from continuing the allegedly deceptive practice").

20   Here, Ms. Nacarino "seeks an order enjoining Defendant from continuing to conduct business

21   through unlawful acts and practices and to commence a corrective advertising campaign," alleging

22   that she "lacks an adequate remedy at law for future harm."  SAC ¶¶ 69, 71.  The Court has also

23   held, as discussed above, that she has standing to pursue injunctive relief.  *Supra* Part IV.D.

24   Therefore, because the injunctive relief that Ms. Nacarino requests "is prospective" and her

25   "remedy at law, damages, is retrospective," her claim for an injunction under the UCL's unlawful

26   prong is not barred by *Sonner*.  *See Zeiger*, 2021 WL 756109, at *21-22 ("[O]n the facts of a case

27   like this, California's consumer protection laws permit courts to issue injunctions that serve

28   different purposes and remedy different harms than retrospective damages.").

21

1    Regarding the second question, whether Ms. Nacarino may pursue equitable restitution or

2  disgorgement for her claim under the UCL's unlawful prong, she "fails to demonstrate that she

3  lacks an adequate legal remedy in this case" and her restitution/disgorgement claim must therefore

4  be dismissed.  *See Sonner*, 971 F.3d at 845.  As noted above, Ms. Nacarino contends that she

5  "lacks an adequate remedy at law" because her claim under the UCL's unlawful prong "is rooted

6  in a different theory of liability than [her] other claims."  SAC ¶ 71.  But she fails to allege any

7  specific facts—*e.g.*, that she would receive less compensation via damages than restitution—

8  showing that damages under the CLRA are necessarily "inadequate or incomplete, and nothing in

9  the record supports that conclusion."  *See Sonner*, 971 F.3d at 844; *see also Anderson v. Apple

10 Inc.*, 500 F. Supp. 3d 993, 1009 (N.D. Cal. 2020) ("Under *Sonner*, the plaintiffs are required, at a

11 minimum, to plead that they lack an adequate remedy at law, which they have not done. . . . They

12 do not attempt to argue, for instance, that the equitable restitution they request would go beyond

13 the damages available to them.").  Put another way, Ms. Nacarino's inability to obtain damages

14 here results from her CLRA claim's failure on the merits; she has not demonstrated that there is an

15 inherent limitation of the legal remedy that renders it inadequate.  Ms. Nacarino also does not

16 "make any related argument, such as showing that restitution under the CLRA or UCL would be

17 more certain, prompt, or efficient than the legal remedies [she] request[s]."  *Id.* (citing *Am. Life

18 Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937)).  And while the court in *Elginy v. AGA Service

19 Co.*, 2021 WL 1176535 (N.D. Cal. Mar. 29, 2021), suggested that a plaintiff could pursue

20 equitable remedies under the UCL where such claims were "rooted in a different theory" of

21 liability and involved different factual allegations than her claims for damages, *id.* at *15, Ms.

22 Nacarino's various "claims are rooted in the same allegations that labeling the Product 'vanilla' is

23 misleading to consumers *and* a violation of the FDA regulations," Reply at 15 (emphasis in

24 original).

25    The Court therefore finds that Ms. Nacarino has failed to "establish that she lacks an

26 adequate remedy at law" with respect to her claim for restitution or disgorgement under the UCL's

27 unlawful prong.  *See Sonner*, 971 F.3d at 844.  As such, her restitution/disgorgement claim

28 pursuant to that provision is dismissed.  Because the Court is unable to conclude that amendment

United States District Court
Northern District of California

would be futile, however, Ms. Nacarino is given leave to amend her complaint to plead that damages are inadequate and that she is thus entitled to seek equitable restitution under the UCL's unlawful prong. *See Anderson*, 500 F. Supp. 3d at 1009-10 ("[P]laintiffs must adequately allege that, under usual principles of equity, their remedies at law would be inadequate to what restitution could provide.").

## V.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Chobani's motion to dismiss with respect Ms. Nacarino's deceptive labeling claims under the UCL's unfair and fraudulent prongs, the FAL, and the CLRA without leave to amend.  The Court **GRANTS in part** and **DENIES in part** Chobani's motion with respect to Ms. Nacarino's claim under the UCL's unlawful prong: Ms. Nacarino has standing to pursue injunctive relief and her claim for injunctive relief is not barred by the inadequate-remedy-at-law doctrine; that doctrine does, however, preclude her request for restitution or disgorgement.  Ms. Nacarino is given leave to amend her claim under the UCL's unlawful prong to plead the inadequacy of legal remedies with respect to her request for equitable restitution.  The amended complaint shall be filed within thirty (30) days from the date of this order.

This order disposes of Docket No. 30.


**IT IS SO ORDERED**.


Dated: August 9, 2021

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California